UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                         Case No. 05-CR-153

JOHN LAVELL DAVIS,

    Defendant.

---

### RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

### I. PROCEDURAL BACKGROUND

On June 21, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a one-count indictment naming John Lavell Davis ("Davis") as the defendant. The indictment alleges *inter alia* that on or about February 22, 2004, Davis, who had been previously convicted of a felony, did knowingly possess a firearm, to wit, a Bryco, model Jennings Nine, 9mm pistol, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). At his arraignment Davis entered a not guilty plea. His trial is currently scheduled to commence before the Honorable Lynn Adelman on October 24, 2005, with a final pretrial to be conducted on October 7, 2005.

On August 18, 2005, Davis filed a motion to suppress physical evidence. Specifically, Davis seeks "an order excluding from evidence all items seized from . . . the residence of 3912-14 West Cherry Street in the city and county of Milwaukee by Milwaukee Police Department officers on February 22, 2004 . . . because the residence was entered and searched without a warrant, exigent circumstances or consent." (Def.'s Mot. at 1.) On August 31 and September 12, 2005, an

evidentiary hearing was conducted on the defendant's motion. Two witnesses testified at that hearing: Milwaukee Police Detective Thomas Boelke ("Boelke") and Milwaukee Police Officer Joseph Warren ("Warren"). After the hearing concluded, the parties were afforded an opportunity to present written submissions in support of their respective positions regarding the issues presented by the motion, those issues being (1) the defendant's "standing" to challenge the legality of the search and (2) the legality of the search. The parties have now presented their written submissions and the court has considered the same. For the reasons which follow it is recommended that the defendant's motion to suppress be denied.

## II. FACTUAL BACKGROUND

As stated previously, two witnesses testified at the hearing. Warren testified that on February 22, 2004, he was assigned to Area Saturation Patrol (ASP) along with other officers, including Milwaukee Police Officers Lough and Campbell. Sgt. Chris Brown had previously received citizen complaints that drugs were being sold at the rear of the residence at 3912-14 W. Cherry Street. Thus, Warren, Lough, and Campbell went to the alley located behind the Cherry Street residence and sat in their vehicle watching the residence. This was at about 10:30 pm. They were located approximately 100 feet from the residence. During a ten to fifteen minute period of time, Warren saw four persons go to the rear door of the residence (there was only one rear door). Although Warren did not see anything actually being exchanged or obtained by those four persons, he suspected (based on the aforementioned citizen complaints) that they went to the rear door to engage in drug transactions.

Warren, Lough, and Campbell then exited their vehicle and proceeded to the rear door. They did so with the intention of conducting a "knock and talk." A "knock and talk" is conducted by

2

knocking on the door of a residence and talking with whomever answers the door for the purpose of determining the nature of what might be going on in the residence.

Warren knocked on the rear door. After he did so, Warren observed a person whom he knew to be Gordon Dillard look out the window and see Warren, who was dressed in his police uniform. Dillard then tossed something out the window, which turned out to be a bag of cocaine and a bag of marijuana. Warren was told by one of the other officers who retrieved the bags that it appeared to be cocaine. Warren then heard Dillard yell that the police were at the door. Warren immediately broke through the rear door and ascended the rear steps which led to the upper residence (3914 W. Cherry Street). Warren entered the residence without first attempting to obtain a search warrant because he believed that any drugs that might be in the upper residence would be disposed of before a warrant could be obtained.

When Warren reached the top of the stairs, he opened the door to the upper unit. The rear door opened into the kitchen. Warren entered the kitchen and saw two persons whom he knew to be Gordon Dillard and the defendant, Davis, running from the kitchen into the living room/dining room area towards the front of the unit. As Davis ran from the kitchen, Warren saw him hold in his hand a dark item that appeared to be a gun. Warren yelled "gun," at which point Davis dropped the item which, indeed, turned out to be a 9mm gun.

Warren pursued Dillard and Davis down the front steps of the residence and, along with the other officers, was able to subdue Davis and Dillard by placing them on the floor. After Dillard and Davis were subdued and handcuffed, they were lifted from the floor of the front hallway. Upon Davis' being lifted from the floor the officers found under him a magazine containing 9mm ammunition.

Warren further testified that during the course of his duties as a Milwaukee police officer he has had occasion to enter numerous living units that are used as drug houses. His observations of the interior of 3914 W. Cherry Street (the upper unit) lead him to conclude that it was a drug house. This is because of the fact that in the kitchen there was a table and a couple of chairs, with drugs on the table. Moreover, in the living room there were only a couch and one chair, and in only one of the bedrooms was there a mattress. There was no food in either the refrigerator or the cupboards. Warren also did not recall seeing any plates or eating utensils.

Boehlke testified that on February 23, 2004 at approximately 9:45 am, he interviewed Davis at the Police Administration Building. At that time Davis told Boehlke that his address was 3108 N. 44th Street. Davis also gave information to Boehlke with respect to the events of February 22, 2004 at 3912-14 W. Cherry Street. Specifically, the signed statement given by Davis to Boehlke (which was received into evidence as Exhibit 1) states, in pertinent part, as follows:

> Davis states that Gordon Dillard ("Fatty") is a friend who he has known for many years. He knows that Dillard sells drugs but stated that he himself has never worked for or with Dillard. Davis states that on the night he got arrested with Dillard he had been visiting at his sister's (Tynika Davis) house 3746 W. Galena. He decided he needed to get home because he had school (MATC) in the morning. He needed a ride so he walked to his auntie's (Nichole Yotis Davis)(phonetic) place near 39 & Cherry to see if he could get a ride. When he got to his auntie's place he saw that Dillard was there. This did not surprise him because Dillard has been hanging around with his family for years. Davis knocked on the front door and Dillard let him in. They remained in the hallway at the bottom of the steps that lead to the upper unit for just a few minutes when the police came down the steps from the upper unit yelling for them to put his hands up. Davis states he turned toward the door and put his hands up and the police jumped on him.

(Ex. 1 at 2.)

4

## III. DISCUSSION

As stated previously, the defendant's motion presents two issues for resolution. The first, and potentially dispositive, issue is whether Davis has "standing" to challenge the warrantless entry into the residence. Stated another way, the first issue to resolve is whether Davis had a reasonable expectation of privacy in the place searched and whether that expectation was reasonable, i.e., one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978). In my opinion, Davis has not demonstrated that he had a reasonable expectation of privacy in the residence at 3914 W. Cherry Street. Accordingly, he cannot object to the legality of the warrantless entry and search of such residence. For that reason alone, his motion to suppress should be denied.

In *Minnesota v. Carter*, 525 U.S. 83 (1998) the Supreme Court had occasion to discuss the circumstances under which persons who were in an apartment during a search could claim the protection of the Fourth Amendment. While recognizing that "an overnight guest in a home may claim the protection of the Fourth Amendment . . . one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90. In *Carter* the facts were as follows:

> James Thielen, a police officer in the Twin Cities' suburb of Eagan, Minnesota, went to an apartment building to investigate a tip from a confidential informant. The informant said that he had walked by the window of a ground-floor apartment and had seen people putting a white powder into bags. The officer looked in the same window through a gap in the closed blind and observed the bagging operation for several minutes. He then notified headquarters, which began preparing affidavits for a search warrant while he returned to the apartment building. When two men left the building in a previously identified Cadillac, the police stopped the car. Inside were respondents Carter and Johns. As the police opened the door of the car to let Johns out, they observed a black, zippered pouch and a handgun, later determined to be loaded, on the vehicle's floor. Carter and Johns were arrested, and

> a later police search of the vehicle the next day discovered pagers, a scale, and 47 grams of cocaine in plastic sandwich bags.
>
> After seizing the car, the police returned to Apartment 103 and arrested the occupant, Kimberly Thompson, who is not a party to this appeal. A search of the apartment pursuant to a warrant revealed cocaine residue on the kitchen table and plastic baggies similar to those found in the Cadillac. Thielen identified Carter, Johns, and Thompson as the three people he had observed placing the powder into baggies. The police later learned that while Thompson was the lessee of the apartment, Carter and Johns lived in Chicago and had come to the apartment for the sole purpose of packaging the cocaine. Carter and Johns had never been to the apartment before and were only in the apartment for approximately 2 ½ hours. In return for the use of the apartment, Carter and Johns had given Thompson one-eighth of an ounce of the cocaine.

*Carter*, 525 U.S. at 85-86.

In finding that Carter and Johns had no reasonable expectation of privacy that was invaded by Thielen's peering through the window of the apartment, the court drew a distinction between those who were overnight guests and therefore could claim the protection of the Fourth Amendment (as typified by the guest in *Minnesota v. Olson*, 495 U.S. 91 (1990)), and those who were merely "legitimately on the premises" and therefore could not do so. The court stated that, while the facts in *Carter* were somewhere in between those two circumstances,

> the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

*Carter*, 525 U.S. at 91.

The facts in the case at bar are not entirely dissimilar from those in *Carter*. To be sure, Boehlke testified that Davis told him he was going to his auntie's house near 39th and Cherry to get a ride home and that he saw Dillard when he arrived there. However, the only sworn testimony

6

Case 2:05-cr-00153-LA   Filed 09/20/05   Page 6 of 9   Document 20

before this court regarding what actually transpired on the evening of February 22, 2004 came from the mouth of Warren. And Warren testified that, in his opinion, the residence at 3914 W. Cherry Street was indeed a drug house, that drugs were found in the premises, and that Davis ran from the kitchen area with a handgun as Warren entered the kitchen. In other words, there is no testimony that Davis' auntie actually lived at 3914 W. Cherry Street, that Davis was a guest of his auntie's (overnight or otherwise), or that he was even in the residence with her permission. Instead, at a minimum, the reasonable conclusion to be drawn from the sworn testimony given is that Davis was present while drug distribution activities were taking place in a drug house, and most likely, was complicit in those illicit activities. Such being the case, like the respondents in *Carter*, Davis has not demonstrated that he had a reasonable expectation of privacy in the residence at 3914 W. Cherry Street. Accordingly, even if the warrantless entry had been conducted in violation of someone's Fourth Amendment rights, it was clearly not conducted in violation of Davis's Fourth Amendment rights. For this reason alone, Davis' motion to suppress should be denied.

Moreover, even if Davis had demonstrated a reasonable expectation of privacy in the residence at 3914 W. Cherry Street, the evidence nevertheless shows that there were exigent circumstances facing Warren and the other officers which justified their entering that residence without a warrant.

It is well-settled that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). However, such searches and seizures are permitted when probable cause and exigent circumstances exist. *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984)). Exigent circumstances exist when there is a compelling need for official action and no time

7

to secure a warrant. *Id.* at 482. It is the government's burden to prove that its agents had an objectively reasonable belief that exigent circumstances existed at the time of the warrantless entry into the defendant's premises. *Id.* When determining whether exigent circumstances exist, the court must analyze the situation from the perspective of the officers at the scene. The court is not to ask what the police *could* have done but rather whether they had, at the time, a reasonable belief that there was a compelling need to act and no time to procure a search warrant. *Id.*

Exigent circumstances have been found to exist when "the police have an objective and reasonable fear that evidence is about to be destroyed." *Id*. (quoting *United States v. Napue*, 834 F.2d 1311, 1326 (7th Cir. 1987)). In such a situation, the court asks "whether 'the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989) (quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987)).

Looking at the totality of the circumstances presented in the case, I find that there was probable cause to believe that there were drugs in the upper unit and that exigent circumstances existed which justified the officers' warrantless entry into the residence. As set forth above, Warren had been made aware of citizen complaints to the effect that drugs were being sold out of the rear of the residence at 3912-14 W. Cherry Street. His surveillance of the residence for about ten or fifteen minutes during the evening of February 22, 2004, revealed activity which somewhat corroborated the citizen complaints. Then, when he went to the back door to conduct a knock and talk, he saw Dillard look out the window and see that the person knocking was a police officer, he saw Dillard toss out the window what looked to be (and turned out to be) cocaine, and he heard Dillard yell to whomever else was in the upper unit that the police were at the door. At that point,

8

there was probable cause to believe that there were drugs and evidence of drug dealing located in the upper unit. Moreover, Dillard's action in discarding some drugs out the window and his yelling to whomever else was in the unit that the police were at the door "would lead an experienced [police officer] to believe that evidence might be destroyed before a warrant [for the upper unit] could be secured." *de Soto*, 885 F.2d at 367. Simply stated, there were exigent circumstances which justified the warrantless entry. Such being the case, even if Davis had a reasonable expectation of privacy in the premises at 3912-14 W. Cherry Street on February 22, 2004, his motion to suppress should nevertheless be denied.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

**SO ORDERED** this __20th__ day of September 2005, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

9

Case 2:05-cr-00153-LA   Filed 09/20/05   Page 9 of 9   Document 20